*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
                            *Plaintiff-Appellee,*

          *v.*                                          No. 13-3479

JEFFREY J. REICHERT,
                            *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:12-cr-00177-1—Donald C. Nugent, District Judge.

Argued: October 4, 2013

Decided and Filed:  March 28, 2014

Before:  ROGERS, GRIFFIN, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Darin Thompson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant.  Robert W. Kern, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:** Darin Thompson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant.  Robert W. Kern, Chelsea S. Rice, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

        GRIFFIN, J., delivered the opinion of the court, in which ROGERS, J., joined. DONALD, J. (pp. 15–27), delivered a separate dissenting opinion.

_____

## OPINION

_____

        GRIFFIN, Circuit Judge.  Jeffrey J. Reichert appeals his criminal conviction and sentence under the Digital Millennium Copyright Act (the "DMCA") asserting three grounds:  (1) that the jury received an inaccurate "deliberate ignorance" instruction that

had the effect of negating the requirement that Reichert's conduct be a "willful" violation of the DMCA; (2) that the exclusion of a defense witness' testimony violated Reichert's constitutional right to present a defense; and (3) that he was improperly assessed a "special skills" sentencing enhancement under U.S.S.G. § 3B1.3.  We hold that the jury instructions as a whole properly stated the law, the excluded testimony was not so vital to Reichert's defense that its exclusion caused him constitutional injury, and Reichert's self-taught technical expertise merited a § 3B1.3 enhancement.  We therefore affirm.

I.

"Congress enacted the DMCA in 1998 to comply with international copyright treaties and to update domestic copyright law for the online world."  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  In large part, the DMCA was intended to give copyright owners additional means to protect copyrighted materials in the digital age.  Although copyright owners often attempted to protect digitized materials behind digital passwords or encryption codes, "[p]rior to the DMCA, a copyright owner would have had no cause of action against anyone who circumvented any sort of technological control, but did not infringe [the copyright]."  *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1195–96 (Fed. Cir. 2004).  Due to the ease of digital piracy, copyright owners feared that the ability to pursue only infringers, rather than those who "picked the lock" and enabled the infringement to occur in the first place, was inadequate to protect their copyrighted material.  *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001).

In response to this problem, the DMCA gave copyright owners a remedy against those who did not themselves infringe a copyright but instead circumvented technological controls and thereby enabled others to infringe.  It did so by creating both "circumvention liability for digital trespass under [17 U.S.C.] § 1201(a)(1)," and "trafficking liability under [17 U.S.C.] § 1201(a)(2) for facilitating such circumvention." *Chamberlain Group*, 381 F.3d at 1196.  Thus, the DMCA "targets the *circumvention* of digital walls guarding copyrighted material (and trafficking in circumvention tools),"

even though it "does not concern itself with the *use* of those materials after circumvention has occurred." *Corley*, 273 F.3d at 443; *see also MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 366 (5th Cir. 2010). Circumventing or trafficking in circumvention tools in violation of § 1201 is a criminal offense if it is committed "willfully" and for commercial or private financial gain. 17 U.S.C. § 1204(a).

Reichert was prosecuted under the DMCA for trafficking in circumvention technology. Federal agents had begun investigating Xbox-scene.com, a website that hosted online forums dedicated to the discussion of modifying video game consoles by installing "modification chips" (or "mod chips") in them so that they could run software for which the consoles were not originally designed. Reichert was one of the moderators of the discussion forums hosted on Xbox-scene.com, and an undercover agent contacted him in 2007, requesting a modified Nintendo Wii. Reichert responded to the agent's requests, purchased a Wii, installed a modification chip, and sold the modified Wii to the agent for a $50 profit. When the Wii was tested, it was able to play both legitimate video games and pirated ones. Agents subsequently obtained a search warrant and seized modification chips, a soldering iron, computers, and business cards advertising Reichert's services from Reichert's residence, as well as from the garage of one of his friends, Kevin Belcik. Reichert ultimately was charged in a one-count indictment under 17 U.S.C. § 1201(a)(2)(A), which prohibits, in relevant part, the trafficking of any technology that "is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected [by copyright]." *Id.*

At trial, the government put on evidence that modification chips are used to fool or bypass a game console's security measures and enable users to run software for which the console was not originally intended. One of the government's expert witnesses testified that the "primary purpose" of modification chips is to enable a user to play pirated video games. Although each particular hardware version of a console requires its own specialized modification chip, the government's witness detailed in general

terms how a modification chip would typically be installed:  the console would be opened, and wires from the modification chip would be soldered to the appropriate locations on a console's circuit board.  According to the witness, it is a "pretty complicated process," given that the modifier needs to identify the proper locations to which to attach the wires and because holding a soldering iron on the circuit board for too long could damage the board.  As an example, the witness referenced one modification that required soldering twenty-nine individual wires to the circuit board.

Several online postings were also admitted against Reichert at trial.  In one, Reichert informed an inquirer that a specific type of modification chip "is the best chip for sure, but it's not for people, normal people.  You can [s]crew stuff up if you are not careful."  In another, an Xbox-scene.com user lauded Reichert as "the only person . . . on any forum that knew there was another way beside the 29 wire mod" to modify a certain type of console.  Some of Reichert's other online postings directed forum users to sites and chat rooms where they could obtain pirated games and thwart console manufacturers' ability to detect that their consoles were modified.

One government agent noted that in March 2007, Reichert posted on an online forum discussion board, "ha ha, I meant that no one cares if people are doing installs. We aren't technically supposed to do it."  Another agent, who had interviewed Reichert during the search of his residence, testified that, while Reichert "never stated to me that it was illegal to [sell and install modification chips], . . . he did state that he knew the mod chips were in a gray area."  Finally, although one agent testified that Reichert did not knowingly order his modified chips from an international source, another witness testified that "it is pretty well known among the community that in the United States mod chips without licenses are illegal."

After the conclusion of the prosecution's case, Reichert's friend Belcik testified as the lone witness on Reichert's behalf.  Belcik testified that he and Reichert learned in a "vocational program in high school" how to build computers, and that Reichert modified his first Xbox in about 2003, while in eleventh or twelfth grade.  Belcik testified that Reichert believed that some people were using modified consoles to play

illegal software. Belcik began to state that Reichert "indicated that what he was doing was basically a hardware modification, not dissimilar from any work that we would do on a normal PC," but the government objected. The district court sustained the objection and refused to allow Belcik to testify about whether Reichert had ever stated whether he thought his conduct was illegal. Defense counsel proffered that, if the objection had been overruled, Belcik would have testified that Reichert "indicated that he believed that modifying the hardware was legal but selling the copyrighted games was illegal."

Before the jury was instructed, Reichert objected to the proposed instruction on deliberate ignorance, contending that "deliberate actions" must be proven in order to prove deliberate ignorance. The district court overruled Reichert's objection and declined to give the alternative deliberate ignorance instruction proposed by Reichert.

Before instructing the jury on deliberate ignorance, the district court gave the following instruction on "willfulness":

> As used in these instructions, an act is done willfully if it is done voluntarily and intentionally with the intent to do something unlawful, that is, with the intent either to disobey or disregard the law.

> While a person must have acted with the intent to do something the law forbids, the person need not be aware of the specific law or the rule his conduct is violating. Willfulness requires the Government to prove that the law imposed a duty on the Defendant, that the Defendant knew of this duty, and that he voluntarily and intentionally violated that duty.

The court then gave the following deliberate ignorance instruction:

> Next, I want to explain a little something about proving a Defendant's knowledge. No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the Defendant deliberately ignored a high probability that he was trafficking in technology primarily designed to circumvent technological measures designed to effectively control access to a work copyrighted under federal law, then you may find that he knew he was violating the Digital Millennium Copyright Act.

> But to find this, you must be convinced beyond a reasonable doubt that the Defendant was aware of a high probability that he was violating the

Digital Millennium Copyright Act, and that the Defendant deliberately closed his eyes to what was obvious.

Carelessness or negligence or foolishness on his part is not the same as knowledge and is not enough to convict.

The jury convicted Reichert on the indictment's lone charge. The presentence report ("PSR") prepared in Reichert's case assigned him an offense level of 12 under U.S.S.G. § 2B5.3(b)(3)(B) and added a two-point "special skills" enhancement under U.S.S.G. § 3B1.3, concluding that Reichert's crime was facilitated by his possession of technical computer skills "not . . . possessed by members of the general public." Reichert's total offense level of fourteen and criminal history category of I subjected him to an advisory Guidelines range of fifteen to twenty-one months.

Reichert objected to the special skills enhancement, but the district court overruled his objection, expressing its opinion that the enhancement was proper. Nevertheless, the court observed that Reichert was "getting a tough deal" and varied downward "two levels" from the Guidelines, ultimately sentencing Reichert to twelve months and one day of imprisonment. Reichert now appeals his conviction and sentence.

II.

A. Jury instructions.

Reichert's first line of argument, which implicates the jury's finding that his conduct was "willful," is notably narrow. Reichert does not argue that the pertinent portions of the DMCA are so vague or of such uncertain application that no defendant could know that his conduct was actually illegal. Nor does Reichert challenge any of the jury's findings—including its willfulness finding—as supported by insufficient evidence.

Instead, Reichert claims that the jury was given a deliberate ignorance instruction that was erroneous in at least two respects. First, Reichert argues that the instruction failed to properly reflect that a defendant is willfully blind only if he took "deliberate

action" to avoid actual knowledge. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). But Reichert is incorrect. The deliberate ignorance instruction given in this case tracks the language of Sixth Circuit Pattern Criminal Jury Instruction § 2.09. The pattern instruction explicitly incorporates the requirement that a defendant act "deliberately" to avoid full knowledge, and we have "repeatedly" held the instruction to be an accurate statement of the law. *United States v. Mitchell*, 681 F.3d 867, 876 n.51 (6th Cir. 2012).

Second, Reichert asserts that the deliberate ignorance instruction incorrectly implemented the pattern jury instruction and consequently eviscerated the DMCA's willfulness requirement by allowing the jury to convict him upon finding only that he knew that he was trafficking in circumvention technology, rather than after finding that he knew that he was violating the law by trafficking in such technology. Although a district court's refusal to give a jury instruction is reviewed for abuse of discretion, this court reviews de novo a claim that a jury instruction inaccurately stated the law. *United States v. Roth*, 628 F.3d 827, 833 (6th Cir. 2011). As we have made plain, "no single provision of the jury charge may be viewed in isolation; rather, the charge must be considered as a whole." *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). Reversal is warranted only "if the instructions, viewed as a whole, were confusing, misleading and prejudicial." *United States v. Burchard*, 580 F.3d 341, 345 (6th Cir. 2009). By contrast, where the instructions, "taken as a whole, fairly and adequately submit[ ] the issues and applicable law to the jury," our inquiry ends, as a defendant cannot be improperly prejudiced by a jury instruction that is warranted by the evidence and that accurately states the law. *United States v. Zidell*, 323 F.3d 412, 427 (6th Cir. 2003).

Despite Reichert's assertions, we cannot agree with Reichert that the jury instructions, viewed as a whole, improperly negated the DMCA's willfulness requirement. No court has yet discussed the reach of 17 U.S.C. § 1204(a)'s willfulness requirement, and on this appeal we do not decide its scope. For this appeal, the parties agree that it requires the government to prove that Reichert voluntarily and intentionally

violated a known legal duty.[1]   This is consistent with our typical approach, as "[g]enerally . . . , in criminal cases, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful."  *Roth*, 628 F.3d at 834 (internal quotation marks omitted).  It is also ordinarily the case that a defendant need not be aware of the specific provision of law that his conduct violates, as long as he is aware that his act is illegal.  *Id.*; *see Bryan v. United States*, 524 U.S. 184, 196 (1998) (willful violation of 18 U.S.C. § 924(a)(1)(D) requires only "knowledge that the conduct is unlawful," not knowledge of the specific legal provisions prohibiting the defendant's conduct); *see also United States v. Cross*, 816 F.2d 297, 300 (7th Cir. 1987).  Reichert also concedes that the DMCA's willfulness requirement may be satisfied by a showing of willful blindness; that is, a defendant's conscious decision to remain ignorant of the illegality of his conduct even when the defendant is aware of a high probability that his conduct is in fact illegal.  *See Mitchell*, 681 F.3d at 876–77.

Reichert's argument rests primarily on the first portion of the deliberate ignorance instruction.  It advised the jury, "If you are convinced that the Defendant deliberately ignored a high probability that he was trafficking in technology primarily designed to circumvent technological measures designed to effectively control access to a work copyrighted under federal law, then you may find that he knew he was violating the Digital Millennium Copyright Act."  Given that this language hinges the requisite *mens rea* finding on Reichert's knowledge that the technology in which he trafficked was primarily purposed to facilitate illegal conduct, Reichert's claim that it eviscerated the DMCA's willfulness requirement is tenuous.  *See Roth*, 628 F.3d at 834–35 (indicating that awareness of broad criminal regulations obviously applicable to defendant's conduct may suffice for willfulness).  Still, devoid of context, this part of the instruction lends some support to Reichert's position, as it seems to inform the jury that

---

[1]The government does not argue in this case that the willfulness requirement is met by a defendant's knowledge that the technology trafficked in was primarily designed for purposes known to be illegal.

if Reichert deliberately ignored a high probability that he merely engaged in the conduct at issue, then the jury could find that Reichert knew that his conduct violated the DMCA.

But Reichert's focus is too myopic. Even to the extent that the challenged portion of the instruction could have been more precise, it was not given in a vacuum. Instead, it was sandwiched between two instructions that stated the stricter requirement and clarified the challenged language. Immediately before giving the challenged instruction, the district court gave an instruction on "willfulness," explaining that an act is willful if done "with the intent either to disobey or disregard the law," that the defendant "must have acted with the intent to do something the law forbids," and that the government must prove "that the law imposed a duty on the Defendant, that the Defendant knew of this duty, and that he voluntarily and intentionally violated that duty." And immediately after giving the portion of the deliberate ignorance instruction to which Reichert objects, the district court cautioned the jury that, to find that Reichert knew that he was violating the DMCA, "you must be convinced beyond a reasonable doubt that the Defendant was aware of a high probability that he was violating the Digital Millennium Copyright Act, and that the Defendant deliberately closed his eyes to what was obvious."

In context, therefore, the language relied upon by Reichert did not detract from the jury instructions' overall import: when viewed "as a whole," the jury instructions given in this case properly instructed the jury on the issue of willfulness. *Ross*, 502 F.3d at 527. Reichert has never objected to the district court's willfulness instruction, and it informed the jury that, for a defendant's conduct to be willful, he "need not be aware of the specific law or the rule his conduct is violating." Even in Reichert's formulation, then, the jury was not required to find that Reichert knew that his conduct violated any specific statute; all that was required to convict Reichert was a finding that he knew that his conduct was illegal. *Roth*, 628 F.3d at 834–35. This is exactly what the district court's "willfulness" instruction told the jury, and the mildly imprecise deliberate ignorance instruction did not fatally undermine it.

Having been properly instructed, the jury found that Reichert constructively knew that his conduct was against the law, given his admissions that he was operating in a "gray" area of the law and was "technically" not supposed to be engaging in his conduct. Reichert does not directly challenge the jury's factual finding in this regard, claiming that he is due a reversal based purely on instructional error. Because the jury instructions accurately stated the law, however, Reichert's position is without merit.[2]

## B. Constitutional right to present a defense.

Reichert next claims that he was denied his constitutional right to present a defense when the district court excluded Belcik's testimony indicating that Reichert had previously expressed a belief that modifying consoles was not illegal. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotation marks and citations omitted).

Reichert's decision to frame his argument in constitutional terms is significant. Where a defendant attacks an evidentiary ruling as violating the Sixth Amendment, review of the legal aspects of the constitutional violation is de novo. *United States v. Hardy*, 586 F.3d 1040, 1043 (6th Cir. 2009). *But see United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003) ("An appellate court reviews all evidentiary rulings—including constitutional challenges to evidentiary rulings—under the abuse-of-discretion standard."). But, of course, a defendant "does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (internal alterations and quotation marks omitted). Instead, "the Constitution permits judges to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Holmes*, 547 U.S.

---

[2]Because the pertinent willfulness and deliberate ignorance principles were "substantially covered by the actual jury charge," the district court did not abuse its discretion in declining to give Reichert's proposed instruction instead of the one actually used. *United States v. Blanchard*, 618 F.3d 562, 573 (6th Cir. 2010) (internal quotation marks omitted).

at 326–27 (internal alterations and quotation marks omitted); *United States v. Humphrey*, 608 F.3d 955, 962 n.3 (6th Cir. 2010). And even "erroneous evidentiary rulings rarely constitute a violation of a defendant's right to present a defense." *Hardy*, 586 F.3d at 1044. In fact, the exclusion of defense evidence violates a defendant's constitutional right to present a defense only where it is "arbitrary" or "disproportionate"; that is, where "important defense evidence" is excluded without serving "any legitimate interests" or in a manner that is "disproportionate to the ends that [the rationale for exclusion is] asserted to promote." *Holmes*, 547 U.S. at 324, 325, 326 (internal quotation marks omitted).

Because a defendant suffers a constitutional violation only if evidence in which the defense has a "weighty interest" is impermissibly excluded, *see Ferensic v. Birkett,* 501 F.3d 469, 475–76 (6th Cir. 2007), the arbitrary or disproportionate exclusion of defense evidence has constitutional significance only if the excluded evidence, "evaluated in the context of the entire record[,] creates a reasonable doubt that did not otherwise exist." *Blackwell*, 459 F.3d at 753 (quotation marks and internal alteration omitted).

We readily conclude that the exclusion of Belcik's testimony did not cause Reichert a constitutional injury. To be sure, the statements may have been admissible under Federal Rule of Evidence 803(3) as a statement of Reichert's then-existing state of mind. However, the government correctly observes that Belcik admitted that he was in the Navy between 2004 and 2008 and that he was "away" in 2007 at the time of Reichert's sale of the modified console and the search of his residence. Belcik never indicated that Reichert's statements about the legality of his conduct were made at any time contemporaneous to 2007. Belcik's proffered testimony, therefore, had only marginal relevance to whether Reichert believed in 2007 that his conduct was legal. And, of course, Reichert had at least one other avenue of putting his own statements and beliefs into evidence: by taking the stand himself. As a result, Reichert's constitutional right to present a defense was not violated by the district court's evidentiary ruling in this respect.

C.  Special skills enhancement.

Finally, Reichert challenges the district court's decision to enhance his sentence pursuant to U.S.S.G. § 3B1.3.  Section 3B1.3 provides for a two-point enhancement if a defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitates the commission or concealment of the offense." *Id.* While a district court's factual findings underlying its application of the enhancement are reviewed for clear error, *see United States v. Wilson*, 345 F.3d 447, 449 (6th Cir. 2003), "[t]he district court's conclusion that skills possessed by a defendant are 'special' within the meaning of the Guideline . . . is a mixed finding of law and fact that this court reviews de novo." *United States v. Godman*, 223 F.3d 320, 322 (6th Cir. 2000); *see United States v. Tatum*, 518 F.3d 369, 372 (6th Cir. 2008).

Reichert contends that his skills are not "special" within the meaning of § 3B1.3. Emphasizing that he is a truck driver with only a high school diploma, Reichert points to § 3B1.3, cmt. n.4, which explains, "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.*  Claiming that he "learned how to modify game consoles through trial and error, using how-to books and information from the internet," Reichert argues that his ability to modify game consoles is not reasonably comparable to the skills listed in Application Note 4.

We cannot agree.  In *Godman*, we observed that requisitely "special" skills may be acquired "through months (or years) of training, *or the equivalent in self-tutelage.*" *Godman*, 223 F.3d at 323 (emphasis added).  Nevertheless, we underscored that, to qualify for the enhancement, a defendant's self-taught skills must be "particularly sophisticated." *Id.*  In this respect, emphasis is best placed "on the difficulty with which a particular skill is acquired." *Id.* at 322.  In *Godman*, for instance, we observed that the defendant's familiarity with a computer scanner and experience in desktop publishing—which the defendant used to manufacture "fairly good quality" counterfeit bills, *id.*—could be replicated in fairly short order by "[m]ost persons of average ability"

with "a minimum of difficulty." *Id.* at 323. We therefore concluded that the defendant's skills were not similar to those listed in Application Note 4 and were thus not special for purposes of the enhancement. *Id.*

Reichert's skills, by contrast, are much more sophisticated than those at issue in *Godman*. Building on skills learned in a high school vocational program that taught him how to build his own computer systems from components, Reichert continued to modify consoles for almost half of a decade. As one of the prosecution's expert witnesses testified at trial, modification of a game system can be a "pretty complicated process," requiring both familiarity with consoles' specialized circuitry and the technical deftness to install the modification chip without damaging the delicate circuit board. Over time, Reichert became exceptionally skilled at making these modifications, eventually serving as a moderator of a specialized internet discussion forum that was largely dedicated to console modification. In fact, Reichert was lauded within the gaming community as one of a very few individuals who knew a work-around for one of the most complicated modifications, and his expert assistance was actively sought out and paid for by gamers who had attempted to modify consoles on their own but were unable to do so or who were trying to prevent console manufacturers from detecting that their consoles had been modified. At one point, Reichert even cautioned that certain types of modifications were "not for . . . normal people" because a modifier could "[s]crew stuff up" if he was "not careful."

This evidence suggests what we did not find in *Godman*: that Reichert's specialized abilities could not be duplicated by "[m]ost persons of average ability" with "a minimum of difficulty." *Godman*, 233 F.3d at 323. Although we agree with Reichert that his skills were not as sophisticated as those at issue in *United States v. Petersen*, 98 F.3d 502, 504–07 (9th Cir. 1996), where the defendant's self-taught computer skills enabled him to hack into the secure computer systems of major financial institutions, the record here demonstrates that Reichert's skill with computer hardware and specialized game console components was substantially more difficult to acquire than the mere familiarity with desktop publishing that was present in *Godman*. *See United States v.*

*Berry*, 717 F.3d 823, 835 (10th Cir. 2013) (ability to drive an eighteen-wheeler truck was sufficiently "special" where the driver possessed almost five years of truck-driving experience in addition to the basic "small potatoes" training initially required). The district court's findings with respect to Reichert's self-training, ability, and sophistication support the determination that his console-modification skills are "special." Accordingly, the district court did not err in applying § 3B1.3's special skills enhancement to Reichert.

III.

Having discerned no reversible error, we affirm Reichert's conviction and sentence.

————————————

**DISSENT**

————————————

BERNICE BOUIE DONALD, Circuit Judge, dissenting.  This appeal concerns the criminal enforcement of the Digital Millennium Copyright Act ("DMCA").  A violation of the DMCA may rise to the level of a criminal offense if it is committed "willfully" and for "commercial advantage or private financial gain." 17 U.S.C. § 1204(a).

As the majority explains, Jeffrey Reichert operated a small business of sorts, providing modification services for video game consoles.  He did so openly and advertised his services on the Internet.  For a fee of approximately $50, Reichert would install a "mod chip" into a video game console that could enhance its functionality in a number of legitimate ways, but that also enabled the console to play unauthorized pirated copies of video games.  In 2007, Reichert sold one of these modified consoles—a Nintendo Wii—to an undercover agent of the U.S. Immigration and Customs Enforcement's ("ICE") anti-piracy enforcement group during an investigation known as Operation Tangled Web.  As a result, Reichert was charged under the DMCA's criminal provision, § 1204(a),  for  trafficking in "service[s], device[s] . . . or part[s] thereof" designed to circumvent technological protection measures that prevent copyright infringement, in violation of the DMCA's anti-circumvention provision. 17 U.S.C. §§ 1201(a)(2)(A).

To establish that Reichert "willfully" violated the DMCA, as is required for criminal liability to attach under § 1204(a), the Government had to prove that Reichert acted "with knowledge that his conduct was unlawful." *United States v. Roth*, 628 F.3d 827, 834 (6th Cir. 2011) (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998)) (internal quotation marks omitted).  Reichert claims that he could not have "willfully" violated the DMCA, because he was unaware that installing mod chips into video game consoles was against the law.

On appeal, Reichert argues, *inter alia*, that the jury instruction provided at trial misstated the DMCA's willfulness requirement and thus precluded the jury from properly considering his defense. The majority concedes that the district court misstated the law in its jury instruction, but concludes that the error was harmless.

If the statute of conviction in this case were itself less ambiguous, I might be more inclined to agree with the majority. Here, however, an otherwise excusable fault in the jury instruction compounded the already heightened risk for error in a case where the charging statute was arguably subject to various interpretations as to the exact legal status of the defendant's conduct. Under these circumstances, I cannot agree with the majority that the additional confusion resulting from the instruction was harmless.

Therefore, I respectfully dissent from Part II of the majority opinion.

I.

This case requires a sophisticated understanding of the technologies at issue and their legal status under the DMCA.

A. Technological Protection Measures and Technological Circumvention

The term "technological protection measure" ("TPM") refers to a wide variety of technologies that are used to control or restrict access to digital content or electronic devices. TPMs "range from the basic to the sophisticated" and include "password protection, copy protection, encryption, digital watermarking and, increasingly, rights management systems incorporating one or more of the foregoing." June M. Besek, *Anti-Circumvention Laws and Copyright: A Report from the Kernochan Center for Law, Media and the Arts*, 27 Columb. J.L. & Arts 385, 391-392 (2004) [hereinafter *Kernochan Study*] (internal quotation marks omitted).

Technology manufacturers use TPMs to limit the functionality of a device or program to a particular use, to implement security measures, to strengthen privacy controls, and of course, to protect intellectual property by preventing unauthorized duplication and/or access. *Id.* at 446-466. Today, the vast majority of commercially

available software and hardware devices are embedded with TPMs designed to achieve the manufacturer's interests in maintaining control of the technology after it has been purchased by a consumer. *Id.* at 446-466. TPMs are useful and often necessary tools for businesses that operate in the digital realm. This is particularly true in the context of intellectual property, where TPMs can provide varying degrees of protection against the general ease with which the Internet and digital technology "have made it possible to reproduce copyrighted works and disseminate them around the world with ever greater speed and efficiency." *Id.* at 391.

On the other hand, overly restrictive or impractical TPMs can also interfere with a consumer's ability to use technology in legitimate, but perhaps unintended or unforeseen ways. *See id.* at 393-394; *see also Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 322 n.159 (S.D.N.Y. 2000), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001). As a result, various circumvention technologies designed to bypass TPMs have proliferated to meet the consumer demand for interoperability and unrestricted access to various technologies. *Id.* at 392 ("TPMs can be broken quickly by the technologically able; these individuals can then create and distribute tools to those with less technological sophistication, allowing them to circumvent protection measures.").

Generally speaking, circumvention technology is computer code that overrides or bypasses a TPM and can be accessed by downloading a program, running an application, or, as in this case, inserting a computer chip embedded with such a code into a hardware device. The DMCA describes circumvention technology as any mechanism that "descramble[s]" or "decrypt[s]" or otherwise "avoid[s], bypass[es], remove[s], deactivate[s], or impair[s]" a technological protection measure. 17 U.S.C. § 1201(a)(3)(A).

Although circumvention technologies can serve a number of legitimate, non-infringing purposes, some can also be used to access or reproduce copyrighted works without authorization. The DMCA was designed in part to remedy this problem.

B. The DMCA's "Anti-Circumvention" Provision, 17 U.S.C. § 1201(a)(2)

Congress enacted the DMCA to address "the ease with which pirates could [use web-based services to] copy and distribute . . . copyrightable work[s] in digital form." *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 458 (2007) (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001)) (internal quotation marks omitted).   Specifically, the DMCA's anti-circumvention provision was designed to support "the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections" by banning the use, manufacture, or sale of technologies that circumvent digital copyright controls.  *Id.*

The DMCA's anti-circumvention provision prohibits the act of circumvention itself, 17 U.S.C. § 1201(a)(1), and also targets the availability of circumvention technologies by making it unlawful to traffic in technologies designed to circumvent TPMs that control access to copyrighted works, § 1201(a)(2).

In order to prevent the DMCA from adversely affecting otherwise lawful uses of circumvention technologies, Congress built several exceptions into the anti-circumvention provision.  *See* 17 U.S.C. § 1201(d)-(j).  Congress also charged the Librarian of Congress, in conjunction with the U.S. Copyright Office and the National Telecommunications and Information Administration ("NTIA") of the U.S. Department of Commerce, with the task of creating additional regulatory exemptions in the future, to ensure that the anti-circumvention provision would continue serving its intended purpose in a rapidly evolving technology industry.  As directed in § 1201(a)(1)(C), the Librarian of Congress carves out exceptions to § 1201 in rulemaking proceedings every three years. *See* Bill D. Herman, *Oscar H. Gandy, Jr., Catch 1201: A Legislative History and Content Analysis of the DMCA Exemption Proceedings,* 24 Cardozo Arts & Ent. L.J. 121, 128 (2006) (providing a comprehensive overview of the rulemaking process).

The legislative history of the DMCA makes clear that the anti-circumvention provision is not intended to function as a comprehensive ban on all circumvention technologies; rather, its purpose is to prevent those technologies from being used as a tool for copyright infringement and to provide remedies for copyright holders against

individuals and entities who facilitate the widespread unauthorized reproduction of copyrighted works by making such technologies available to the public. *See Kernochan Study*, 404-406 (providing a detailed legislative history of the DMCA's anti-circumvention provision); *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 387 F.3d 522, 551-52 (6th Cir. 2004) ("Such a reading would ignore the precise language—'for the purpose of'—as well as the main point of the DMCA—to prohibit the pirating of copyright-protected works such as movies, music, and computer programs."), *aff'd on other grounds*, 572 U.S. ___ (2014).

Accordingly, several courts, including ours, have held that circumvention technologies designed primarily for purposes other than to bypass copyright restrictions are not within the ambit of the DMCA's anti-circumvention provision. *See Lexmark,* 387 F.3d 522 (holding that a modification chip designed to make third party ink cartridges compatible with Lexmark printers was not primarily designed to circumvent copyright and thus did not violate the DMCA); *Chamberlain Group, Inc. v. Skylink Techs., Inc.,* 381 F.3d 1178, 1203-1204 (Fed.Cir.2004) (stating that circumvention alone does not establish a violation of the DMCA unless it can also be demonstrated that there is a nexus between the use of a particular circumvention technology and actual copyright infringement); *see also Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1318 (Fed. Cir. 2005) ("[C]ourts generally have found a violation of the DMCA only when the alleged access was intertwined with a right protected by the Copyright Act.") (*citing Universal City Studios v. Corley,* 273 F.3d 429, 435 (2d Cir.2001); *RealNetworks, Inc. v. Streambox, Inc.,* 2000 WL 127311, at *7 (W.D.Wash. Jan.18, 2000)).

The Ninth Circuit, however, disagrees and construes the DMCA's anti-circumvention more broadly. *See MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F.3d 928, 948 (9th Cir. 2010) (rejecting the "infringement nexus" requirement). As the Ninth Circuit's recent opinion demonstrates, competing interpretations of the anti-circumvention provision give § 1201 the potential to function as a broader prohibition against circumvention technologies with only an incidental relation to copyrighted

works.  *Id.*  Indeed, the circuit split is representative of an ongoing debate over the statutory construction and scope of the DMCA's anti-circumvention provision among scholars and other commentators who question whether certain applications of § 1201 have undermined the delicate balance that Congress sought to achieve between strengthening copyright law and preserving consumer rights, promoting technological innovation, and protecting First Amendment speech in our increasingly digitized culture.  *See Kernochan Study*, at 411-15 (compiling sources).

C. Legal Status of "Mod Chips" and Video Game Console Modifications

A modification chip, or "mod chip," is a computer chip with software that—once installed into a video game system's motherboard—can enhance its capabilities or add to its functionality.  Like other circumvention technologies, mod chips can serve both lawful and unlawful purposes.  Although some modifications are designed to "allow users to play unauthorized and illegal copies" of video games, *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1070 (N. D. Cal. 2005) ("A counterfeit, unlicensed 'burnt' game disc will not play in an unmodified PlayStation console . . . but if a mod chip is installed in a PlayStation console, the counterfeit, unlicensed 'burnt' game disc will play."); many legitimate, non-infringing, uses exist for mod chips that do not involve or facilitate copyright infringement.[1]

The fact that modified video game consoles can be used for both legitimate, non-infringing purposes as well as to facilitate copyright infringement makes it all the more difficult to determine the precise legal status of mod chips.  In a vacuum, the plain

---

[1]For example, a common complaint about the Nintendo Wii is that, unlike other popular video game consoles, such as the Sony Playstation and Microsoft Xbox, the Wii cannot play ordinary DVDs. The demand for a solution to this perceived deficiency is one of several reasons why a consumer might purchase a mod chip or seek to have one installed into a video game console.

Mod chips can also be used to remedy failures and solve problems in video game consoles, or to run back-up copies of legally purchased video games to replace damaged or lost originals. *See 321 Studios v. Metro Goldwyn Mayer Studios, Inc*., 307 F. Supp. 2d 1085, 1097 (N.D.Cal. 2004) (finding that copyright law does not prohibit consumers from creating duplicate "back-up" copies of legally purchased video games).

In addition, mod chips enable video game enthusiasts and more sophisticated gamers to create and play "homebrew" video games developed by independent amateur game creators and hobbyists. *See* Lewis Stevenson, *Fair Circumvention: A Judicial Analysis for the Digital Millennium Copyright Act Using the Playstation 3 As A Case Study,* 21 S. Cal. Interdisc. L.J. 681, 682 n.7 (2012) ("Homebrew is a term for software applications created by consumers rather than licensed developers.") (*citing* Mike Musgrove, *Routine Upgrades are the Bane of 'Homebrew' Enthusiasts,* Wash. Post, July 6, 2006, at D04).

language of § 1201(a), certainly lends itself to a reading under which mod chips would be considered unlawful. *See* 17 U.S.C. § 1201(a)(2)(A). When read in conjunction with the provision's statutory exceptions and subsequent exemptions added through regulatory rulemaking, however, the actual legal status of mod chips and video game console modifications is not entirely clear.

Perhaps the most important of these exceptions is the "reverse engineering" provision, which permits circumvention of TPMs through reverse engineering for the purpose of "achiev[ing] interoperability of an independently created computer program with other programs," that are not otherwise readily available. 17 U.S.C. § 1201(f); *see Lexmark,* 387 F.3d at 549 ("[T]he interoperability provision [was designed to] ensure that the DMCA would not diminish the benefit to consumers of interoperable devices in the consumer electronics environment."). Because video games are essentially computer programs, the reverse engineering exception has often been relied upon for the proposition that video game modifications are not *per se* unlawful under the anti-circumvention provision.[2] Indeed, in the very first rulemaking proceeding to consider exemptions to the DMCA's anti-circumvention provision, the Librarian of Congress considered, but ultimately declined to create an exemption for mod chips designed achieve the interoperability of video games across multiple platforms, based on its reasoning that § 1201(f) was sufficient to safeguard legitimate users of mod chips and modified consoles from adverse action. *See Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies,* 65 Fed. Reg. 64556, 64570 (Oct. 27, 2000) (codified at 37 C.F.R. 201).

---

[2]*See* Vijay G. Brijbasi, *Game Console Modification Chips: The Effect of Fair Use and the Digital Millennium Copyright Act on the Circumvention of Game Console Security Measures,* 28 Nova L. Rev. 411, 436 (2004). Under the reverse engineering exception at § 1201(f), a console modification designed "primarily" for the purpose of enhancing a console's "interoperability," such as accessing legitimately purchased video games across multiple platforms, or to enable the playing of independently designed non-infringing "homebrew" video games would appear to be lawful under the DMCA. *See* Stevenson, *supra* n. 1; Phillip A. Harris Jr., *Mod Chips and Homebrew: A Recipe for Their Continued Use in the Wake of Sony v. Divineo,* 9 N.C. J. L. & Tech. 113, 115-118 (2007). Similarly, installing a mod chip into a console like the Wii for the purpose of enhancing its functionality, so that it can play ordinary and lawfully purchased DVDs, would also seem to fall under the reverse engineering exception at § 1201(f), so long as such a modification was not designed "primarily . . . for the purpose of" playing illegal, pirated video games. *See* 17 U.S.C. §§ 1201(a)(2)(A), 1201(f).

In 2003, however, the Librarian of Congress reversed course and carved out several exemptions for circumvention technologies which had previously been thought to fall within the statutory exception for reverse engineering at § 1201(f). *See generally,* 68 Fed. Reg. 62011 (Oct. 31, 2003). One of those exemptions permitted the circumvention of TPMs on video games and video game consoles for the purpose of accessing "video games distributed in formats that have become obsolete and which require original media or hardware as a condition of access." 68 Fed. Reg. 62011 (Oct. 31, 2003). Although the intent of the 2003 rulemaking was to clarify the DMCA's application to mod chips and other circumvention technologies, the addition of this new regulatory exemption, which covered a particular use for mod chips that had previously been thought to fall under an existing statutory exception, seems to have caused even greater uncertainty. *See generally* Joe Linhoff, *Video Games and Reverse Engineering: Before and After the Digital Millennium Copyright Act*, 3 J. on Telecomm. & High Tech. L. 209, 229 (2004). Subsequent rulemakings renewed this exemption and introduced several others, but did little to clarify the legal status of mod chips and other circumvention technologies under the DMCA. 71 Fed. Reg. 68472, 68476 (Nov. 27, 2006).[3]

## II.

Having established a basic understanding of the DMCA's anti-circumvention provision and the technologies it governs, it is now possible to delve into the more specific argument raised by Reichert's appeal. Reichert argues that the jury instruction provided at trial misstated applicable law and so confused the jury on the willfulness element of the DMCA's criminal provision that the jury was precluded from properly considering his defense. Because I find that the jury instruction fundamentally undercut his defense, which in turn, was particularly susceptible to confusion due to conflicting interpretations of the DMCA, I dissent from the majority's opinion.

---

[3]Meanwhile, at the time of this writing, there are two bills currently pending before Congress that would override much of the framework established through the DMCA's regulatory rulemaking process since its passage. *See* The Unlocking Technology Act of 2013, H.R. 1892, 113th Cong. (2013); The Unlocking Consumer Choice and Wireless Competition Act, H.R. 1123, 113th Cong. (2014).

A. The Jury Instruction

This Court reviews de novo a claim that the jury instruction inaccurately stated the law.  *United States v. Roth*, 628 F.3d 827, 833 (6th Cir. 2011) (*citing United States v. Blanchard,* 618 F.3d 562, 571 (6th Cir. 2010); *H.C. Smith Invs., L.L.C. v. Outboard Marine Co.,* 377 F.3d 645, 650 (6th Cir.2004)).  When reviewing jury instructions, we look to the instruction as a whole to determine whether "they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Burchard,* 580 F.3d 341, 345 (6th Cir. 2009); *see also United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007) ("No single provision of the jury charge may be viewed in isolation; rather, the charge must be considered as a whole.").   A judgment stemming from a jury verdict should be reversed if the instruction, viewed as a whole, was prejudicial, or if the instructions confused or misled the jury about the correct application of the law.  *Roth*, 628 F.3d at 833; *see also Burchard*, 580 F.3d at 345 (citing *United States v. Robinson*, 547 F.3d 632, 637 (6th Cir. 2008)).

A violation of § 1201 is only a criminal offense under § 1204(a) if it is committed "willfully" and for commercial or private financial gain.   The term "willfully," when used in a criminal statute, generally refers to conduct that involves "a bad purpose," or "careless disregard [for] whether a person has the right so to act." *Bryan v. United States*, 524 U.S. 184, 191 n.12, 13 (1998); the term marks a distinction between deliberate criminal conduct and unwitting or oblivious conduct which does not indicate a culpable state of mind. *Id*. at 191.

In order to establish a willful violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful."  *Id*. at 192 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)); *accord Dixon v. United States*, 548 U.S. 1, 5 (2006) ("[T]he term willfully . . . requires a defendant to have acted with knowledge that his conduct was unlawful."); *United States v. Roth*, 628 F.3d 827, 834 (6th Cir. 2011) ("[I]n criminal cases, in order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his

conduct was unlawful."). Therefore, at trial, the Government was required to prove that Reichert knew that it was unlawful for him to sell modified video game consoles.

The district court should have instructed the jury to deliver a guilty verdict if it was convinced that Reichert:

> [D]eliberately ignored a high probability that *he was breaking the law* designed to effectively control access to a work copyrighted under federal law . . .

Instead, the district court instructed the jury to deliver a guilty verdict if Reichert:

> [D]eliberately ignored a high probability that *he was trafficking in technology primarily designed to circumvent technological measures* designed to effectively control access to a work copyrighted under federal law . . .

It is undisputed that, standing alone, this portion of the jury instruction did not properly reflect the DMCA's mandate that, in order for criminal liability to attach, the Government had to prove that Reichert *knew* his conduct to be unlawful.  17 U.S.C. § 1204(a); *Roth*, 628 F.3d at 834 ("[I]n order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.").   Moreover, the district court's error was not a minor misstatement of law—it directly undermined Reichert's only defense at trial.

The only remaining question is whether other portions of the instruction, when combined with the district court's misstatement of law and viewed in its entirety, salvaged the jury instruction such that Reichert was not deprived of a fair trial. In my view, it did not. Accordingly, the judgment should be reversed because the instruction, viewed as a whole, permitted the jury to deliver a guilty verdict upon a lesser finding than the statute's willfulness requirement.  See 17 U.S.C. § 1204.

The majority concludes that the misstated part of the instruction was harmless because it was accompanied by and "sandwiched between" two proper statements of law, but the fact that other portions of the jury instruction provided a more accurate statement of law did nothing to restore the incorrectly stated part of the instruction.  If

the district court had acknowledged its mistake and explicitly corrected itself, then perhaps it could be said that the jury instruction, viewed as a whole, was proper. Here, however, there is simply no way of knowing whether the jurors relied on the district court's incorrect misstatement of law or its accompanying, yet contradictory, correct statements of the law. Although other parts of the instruction may have provided the necessary clarity for *some* jurors to understand what the district court meant, there was no indication that the court was correcting its earlier statement or that the jury should apply the correct statement of the law instead of relying on the district court's incorrect statement. While it is certainly possible that the jury relied on the correct portion of the instruction, the likelihood that it relied on the incorrect portion seems equally probable. Since we simply cannot know, to conclude otherwise would require impermissible speculation. *See Davis v. Georgia*, 451 U.S. 921, 922 (1981) (explaining that reversal is necessary when "[a]n appellate court can do no more than guess at what a jury might have done . . . [if] properly instructed").

I would be more inclined to agree with the majority if the DMCA's anti-circumvention provision were itself less ambiguous. In this case, however, the charging statute was arguably open to various interpretations. Under these circumstances, I cannot agree with the majority that the additional confusion generated by a jury instruction that muddled the mens rea element of the charge was harmless. *See United States v. Salisbury,* 983 F.2d 1369, 1377 (6th Cir. 1993).

The emphasis upon mens rea in the vast majority of criminal statutes is "in keeping with our longstanding recognition of the principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Liparota v. United States*, 471 U.S. 419, 427-28 (1985) (*citing Rewis v. United States*, 401 U.S. 808, 812 (1971); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 437 (1978); *United States v. Bass*, 404 U.S. 336, 347–34, (1971); *Bell v. United States*, 349 U.S. 81, 83 (1955); *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-222 (1952)). The rule of lenity, in turn, "ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the

prosecutor, and the court in defining criminal liability." *Liporta*, at 427-28 (citing *Bass*, 404 U.S. at 348). Where "congressional purpose is unclear," the rule of lenity "provides a time-honored interpretive guideline" that criminal culpability does not attach unless it has been clearly established. *See Liparota*, at 418.

In cases such as this one, where the charging statute is subject to various interpretations, the relationship between adequacy of notice and a statute's scienter requirement may, under certain circumstances, resolve potential ambiguities. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (finding that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed"). Therefore, latent ambiguities in the DMCA's anti-circumvention provision could have been less of a concern in this case if the jury instruction had properly ensured that the Government met its obligation to prove the willfulness element of Reichert's alleged crime. Here, however, the opposite is true—the jury instructions convoluted the scienter element of the charge and aggravated the already heightened risk of error stemming from a statute that was itself subject to various interpretations concerning the exact legal status of the defendant's conduct.

Finally, although the issue on appeal is neither the weight nor sufficiency of the evidence, I mention it here because it leads to the conclusion that an error must have been present for the jury to deliver a guilty verdict despite overwhelming the evidence in support of Reichert's defense. If the evidence at trial had done more to establish the Government's contention that Reichert knew he was breaking the law, then I might be more inclined to agree with the majority. Here, however, Reichert put forth overwhelming evidence to establish his defense. It is undisputed that Reichert operated his console modification business openly; he advertised his services and even opened a separate bank account for the business because he planned to file tax returns on the income it generated. Moreover, at trial, an agent who had engaged in online conversations with Reichert during the investigation testified that Reichert seemed to believe that video game modifications and mod chips occupied a legal "gray area."

Given the ongoing debate over the scope of the DMCA's anti-circumvention provision, Reichert's point of view was not unsupported. *See e.g.*, *Chamberlain,* 381 F.3d at 1203-1204; *Lexmark,* 387 F.3d at 547-48; *cf. MDY Indus.,* 629 F.3d at 948. In fact, several law review articles published around the time of Reichert's arrest suggest that his understanding of mod chips' legal status was no different from the views expressed by individuals who had a much more sophisticated understanding of the law. *See*, *e.g.*, Vijay G. Brijbasi, *Game Console Modification Chips: The Effect of Fair Use and the Digital Millennium Copyright Act on the Circumvention of Game Console Security Measures*, 28 Nova L. Rev. 411, 426 (2004); Phillip A. Harris Jr., *Mod Chips and Homebrew: A Recipe for Their Continued Use in the Wake of Sony v. Divineo,* 9 N.C. J. L. & Tech. 113, 115-118 (2007); Zvi Rosen, *Mod, Man, and Law: A Reexamination of the Law of Computer Game Modifications*, 4 Chi.-Kent J. Intell. Prop. 196 (2005); Lewis Stevenson, *Fair Circumvention: A Judicial Analysis for the Digital Millennium Copyright Act Using the Playstation 3 as a Case Study,* 21 S. Cal. Interdisc. L.J. 681 (2012). Nevertheless, the jury delivered a guilty verdict.

If the jury had received a proper instruction on the law, which imposed the highest possible burden upon the Government to demonstrate that Reichert "willfully" violated the DMCA, it seems highly improbable that it would have convicted Reichert on the evidence presented at trial.

III.

For the foregoing reasons, I respectfully dissent from Part II of the majority opinion. While I agree with the majority as to the other issues presented by this appeal, I would reverse on the basis of the erroneous jury instruction.