BERNICE BOUIE DONALD, Circuit Judge,
dissenting.
This appeal concerns the criminal enforcement of the Digital Millennium Copyright Act (“DMCA”). A violation of the DMCA may rise to the level of a criminal offense if it is committed “willfully” and for “commercial advantage or private financial gain.” 17 U.S.C. § 1204(a).
As the majority explains, Jeffrey Reic-hert operated a small business of sorts, providing modification services for video game consoles. He did so openly and advertised his services on the Internet. For a fee of approximately $50, Reichert would install a “mod chip” into a video game console that could enhance its func *456 tionality in a number of legitimate ways, but that also enabled the console to play unauthorized pirated copies of video games. In 2007, Reichert sold one of these modified consoles — a Nintendo Wii— to an undercover agent of the U.S. Immigration and Customs Enforcement’s (“ICE”) anti-piracy enforcement group during an investigation known as Operation Tangled Web. As a result, Reichert was charged under the DMCA’s criminal provision, § 1204(a), for trafficking in “ser-viee[s], device[s] ... or part[s] thereof’ designed to circumvent technological protection measures that prevent copyright infringement, in violation of the DMCA’s anti-circumvention provision. 17 U.S.C. §§ 1201(a)(2)(A).
To establish that Reichert “willfully” violated the DMCA, as is required for criminal liability to attach under § 1204(a), the Government had to prove that Reichert acted “with knowledge that his conduct was unlawful.” United States v. Roth, 628 F.3d 827, 834 (6th Cir.2011) (quoting Bryan v. United States, 524 U.S. 184, 191, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998)) (internal quotation marks omitted). Reic-hert claims that he could not have “willfully” violated the DMCA, because he was unaware that installing mod chips into video game consoles was against the law.
On appeal, Reichert argues, inter alia, that the jury instruction provided at trial misstated the DMCA’s willfulness requirement and thus precluded the jury from properly considering his defense. The majority concedes that the district court misstated the law in its jury instruction, but concludes that the error was harmless.
If the statute of conviction in this case were itself less ambiguous, I might be more inclined to agree with the majority. Here, however, an otherwise excusable fault in the jury instruction compounded the already heightened risk for error in a case where the charging statute was arguably subject to various interpretations as to the exact legal status of the defendant’s conduct. Under these circumstances, I cannot agree with the majority that the additional confusion resulting from the instruction was harmless.
Therefore, I respectfully dissent from Part II of the majority opinion.
I.
This case requires a sophisticated understanding of the technologies at issue and their legal status under the DMCA.
A. Technological Protection Measures and Technological Circumvention
The term “technological protection measure” (“TPM”) refers to a wide variety of technologies that are used to control or restrict access to digital content or electronic devices. TPMs “range from the basic to the sophisticated” and include “password protection, copy protection, encryption, digital watermarking and, increasingly, rights management systems incorporating one or more of the foregoing.” June M. Besek, Anti-Circumvention Laws and Copyright: A Report from the Rema-chan Center for Law, Media and the Arts, 27 Columb. J.L. & Arts 385, 391-392 (2004) [hereinafter Kemochan Study ] (internal quotation marks omitted).
Technology manufacturers use TPMs to limit the functionality of a device or program to a particular use, to implement security measures, to strengthen privacy controls, and of course, to protect intellectual property by preventing unauthorized duplication and/or access. Id. at 446-466. Today, the vast majority of commercially available software and hardware devices are embedded with TPMs designed to achieve the manufacturer’s interests in maintaining control of the technology after *457 it has been purchased by a consumer. Id. at 446-466. TPMs are useful and often necessary tools for businesses that operate in the digital realm. This is particularly true in the context of intellectual property, where TPMs can provide varying degrees of protection against the general ease with which the Internet and digital technology “have made it possible to reproduce copyrighted works and disseminate them around the world with ever greater speed and efficiency.” Id. at 391.
On the other hand, overly restrictive or impractical TPMs can also interfere with a consumer’s ability to use technology in legitimate, but perhaps unintended or unforeseen ways. See id. at 393-394; see also Universal City Studios, Inc. v. Reimerdes, 111 F.Supp.2d 294, 322 n. 159 (S.D.N.Y.2000), aff'd sub nom. Universal City Studios, Inc. v. Corley, 273 F.3d 429 (2d Cir.2001). As a result, various circumvention technologies designed to bypass TPMs have proliferated to meet the consumer demand for interoperability and unrestricted access to various technologies. Id. at 392 (“TPMs can be broken quickly by the technologically able; these individuals can then create and distribute tools to those with less technological sophistication, allowing them to circumvent protection measures.”).
Generally speaking, circumvention technology is computer code that overrides or bypasses a TPM and can be accessed by downloading a program, running an application, or, as in this case, inserting a computer chip embedded with such a code into a hardware device. The DMCA describes circumvention technology as any mechanism that “descramble[s]” or “decrypt[s]” or otherwise “avoid[s], bypass[es], remove[s], deactivate^], or impair[s]” a technological protection measure. 17 U.S.C. § 1201(a)(3)(A).
Although circumvention technologies can serve a number of legitimate, non-infringing purposes, some can also be used to access or reproduce copyrighted works without authorization. The DMCA was designed in part to remedy this problem.
B. The DMCA’s “Anti-Circumvention” Provision, 17 U.S.C. § 1201(a)(2)
Congress enacted the DMCA to address “the ease with which pirates could [use web-based services to] copy and distribute ... copyrightable work[s] in digital form.” Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 458, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) (quoting Universal City Studios, Inc. v. Corley, 273 F.3d 429, 435 (2d Cir. 2001)) (internal quotation marks omitted). Specifically, the DMCA’s anti-circumvention provision was designed to support “the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections” by banning the use, manufacture, or sale of technologies that circumvent digital copyright controls. Id.
The DMCA’s anti-circumvention provision prohibits the act of circumvention itself, 17 U.S.C. § 1201(a)(1), and also targets the availability of circumvention technologies by making it unlawful to traffic in technologies designed to circumvent TPMs that control access to copyrighted works, § 1201(a)(2).
In order to prevent the DMCA from adversely affecting otherwise lawful uses of circumvention technologies, Congress built several exceptions into the anti-circumvention provision. See 17 U.S.C. § 1201(d)-(j). Congress also charged the Librarian of Congress, in conjunction with the U.S. Copyright Office and the National Telecommunications and Information Administration (“NTIA”) of the U.S. Department of Commerce, with the task of creating additional regulatory exemptions in the *458 future, to ensure that the anti-circumvention provision would continue serving its intended purpose in a rapidly evolving technology industry. As directed in § 1201(a)(1)(C), the Librarian of Congress carves out exceptions to § 1201 in rule-making proceedings every three years. See Bill D. Herman, Oscar H. Gandy, Jr., Catch 1201: A Legislative History and Content Analysis of the DMCA Exemption Proceedings, 24 Cardozo Arts & Ent. L.J. 121, 128 (2006) (providing a comprehensive overview of the rulemaking process).
The legislative history of the DMCA makes clear that the anti-circumvention provision is not intended to function as a comprehensive ban on all circumvention technologies; rather, its purpose is to prevent those technologies from being used as a tool for copyright infringement and to provide remedies for copyright holders against individuals and entities who facilitate the widespread unauthorized reproduction of copyrighted works by making such technologies available to the public. See Kemochan Study, 404-406 (providing a detailed legislative history of the DMCA’s anti-circumvention provision); Lexmark Int’l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 551-52 (6th Cir.2004) (“Such a reading would ignore the precise language — ‘for the purpose of — as well as the main point of the DMCA — to prohibit the pirating of copyright-protected works such as movies, music, and computer programs.”), aff'd on other grounds, 572 U.S. -, 134 S.Ct. 1377, 188 L.Ed.2d 392, 2014 WL 1168967 (2014).
Accordingly, several courts, including ours, have held that circumvention technologies designed primarily for purposes other than to bypass copyright restrictions are not within the ambit of the DMCA’s anti-circumvention provision. See Lex-mark, 387 F.3d 522 (holding that a modification chip designed to make third party ink cartridges compatible with Lexmark printers was not primarily designed to circumvent copyright and thus did not violate the DMCA); Chamberlain Group, Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1203-1204 (Fed.Cir.2004) (stating that circumvention alone does not establish a violation of the DMCA unless it can also be demonstrated that there is a nexus between the use of a particular circumvention technology and actual copyright infringement); see also Storage Tech. Corp. v. Custom Hardware Eng’g & Consulting, Inc., 421 F.3d 1307, 1318 (Fed.Cir.2005) (“[C]ourts generally have found a violation of the DMCA only when the alleged access was intertwined with a right protected by the Copyright Act.”) (citing Universal City Studios v. Corley, 273 F.3d 429, 435 (2d Cir.2001); RealNetworks, Inc. v. Streambox, Inc., 2000 WL 127311, at *7 (W.D.Wash. Jan. 18, 2000)).
The Ninth Circuit, however, disagrees and construes the DMCA’s anti-circumvention more broadly. See MDY Indus., LLC v. Blizzard Entm’t, Inc., 629 F.3d 928, 948 (9th Cir.2010) (rejecting the “infringement nexus” requirement). As the Ninth Circuit’s recent opinion demonstrates, competing interpretations of the anti-circumvention provision give § 1201 the potential to function as a broader prohibition against circumvention technologies with only an incidental relation to copyrighted works. Id. Indeed, the circuit split is representative of an ongoing debate over the statutory construction and scope of the DMCA’s anti-circumvention provision among scholars and other commentators who question whether certain applications of § 1201 have undermined the delicate balance that Congress sought to achieve between strengthening copyright law and preserving consumer rights, promoting technological innovation, and protecting *459 First Amendment speech in our increasingly digitized culture. See Kemochan Study, at 411-15 (compiling sources).
C. Legal Status of “Mod Chips” and Video Game Console Modifications
A modification chip, or “mod chip,” is a computer chip with software ' that — once installed into a video game system’s motherboard — can enhance its capabilities or add to its functionality. Like other circumvention technologies, mod chips can serve both lawful and unlawful purposes. Although some modifications are designed to “allow users to play unauthorized and illegal copies” of video games, Sony Computer Entm’t Am., Inc. v. Filipiak, 406 F.Supp.2d 1068, 1070 (N.D.Cal.2005) (“A unmodified PlayStation console ... but. if a mod chip is installed in a PlayStation console, the counterfeit, unlicensed ‘burnt’ game disc will play.”); many legitimate, non-infringing, uses exist for mod chips that do not involve or facilitate copyright infringement.[1]
The fact that modified video game consoles can be used for both legitimate, non-infringing purposes as well as to facilitate copyright infringement makes it all the more difficult to determine the precise legal status of mod chips. In a vacuum, the plain language of § 1201(a), certainly lends itself to a reading under which mod chips would be- considered unlawful. See 17 U.S.C. § 1201(a)(2)(A). When read in conjunction with the provision’s statutory exceptions and subsequent exemptions added through regulatory rulemaking, however, the actual legal status of mod chips and video game console modifications is not entirely clear.
Perhaps the most important of these exceptions is the “reverse engineering” provision, which • permits circumvention of TPMs through reverse engineering for the purpose of “achieving] interoperability of an independently created computer program with other programs,” that are not otherwise readily available. 17 U.S.C. § 1201(f); see Lexmark, 387 F.3d at 549 (“[T]he interoperability provision [was designed to] ensure that the DMCA would not diminish the benefit to consumers of interoperable devices in the consumer electronics environment.”). Because video games are essentially computer programs, the reverse engineering exception has often been relied upon for the proposition that video game modifications are not per se unlawful under the anti-circumvention provision.[2] Indeed, in the very first rule- *460 making proceeding to consider exemptions to the DMCA’s anti-circumvention provision, the Librarian of Congress considered, but ultimately declined to create an exemption for mod chips designed achieve the interoperability of video games across multiple platforms, based on its reasoning that § 1201(f) was sufficient to safeguard legitimate users of mod chips and modified consoles from adverse action. See Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 Fed.Reg. 64556, 64570 (Oct. 27, 2000) (codified at 37 C.F.R. 201).
In 2003, however, the Librarian of Congress reversed course and carved out several exemptions for circumvention technologies which had previously been thought to fall within the statutory exception for reverse engineering at § 1201(f). See generally, 68 Fed.Reg. 62011 (Oct. 31, 2003). One of those exemptions permitted the circumvention of TPMs on video games and video game consoles for the purpose of accessing “video games distributed in formats that have become obsolete and which require original media or hardware as a condition of access.” 68 Fed.Reg. 62011 (Oct. 31, 2003). Although the intent of the 2003 rulemaking was to clarify the DMCA’s application to mod chips and other circumvention technologies, the addition of this new regulatory exemption, which covered a particular use for mod chips that had previously been thought to fall under an existing statutory exception, seems to have caused even greater uncertainty. See generally Joe Linhoff, Video Games and Reverse Engineering: Before and After the Digital Millennium Copyright Act, 3 J. on Telecomm. & High Tech. L. 209, 229 (2004). Subsequent rulemakings renewed this exemption and introduced several others, but did little to clarify the legal status of mod chips and other circumvention technologies under the DMCA. 71 Fed.Reg. 68472, 68476 (Nov. 27, 2006).[3]
II.
Having established a basic understanding of the DMCA’s anti-circumvention provision and the technologies it governs, it is now possible to delve into the more specific argument raised by Reichert’s appeal. Reichert argues that the jury instruction provided at trial misstated applicable law and so confused the jury on the willfulness element of the DMCA’s criminal provision that the jury was precluded from properly considering his defense. Because I find that the jury instruction fundamentally undercut his defense, which in turn, was particularly susceptible to confusion due to *461 conflicting interpretations of the DMCA, I dissent from the majority’s opinion.
A. The Jury Instruction
This Court reviews de novo a claim that the jury instruction inaccurately stated the law. United States v. Roth, 628 F.3d 827, 833 (6th Cir.2011) (citing United States v. Blanchard, 618 F.3d 562, 571 (6th Cir. 2010); H.C. Smith Invs., L.L.C. v. Outboard Marine Co., 377 F.3d 645, 650 (6th Cir.2004)). When reviewing jury instructions, we look to the instruction as a whole to determine whether “they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision.” United States v. Burchard, 580 F.3d 341, 345 (6th Cir.2009); see also United States v. Ross, 502 F.3d 521, 527 (6th Cir.2007) (“No single provision of the jury charge may be viewed in isolation; rather, the charge must be considered as a whole.”). A judgment stemming from a jury verdict should be reversed if the instruction, viewed as a whole, was prejudicial, or if the instructions confused or misled the jury about the correct application of the law. Roth, 628 F.3d at 833; see also Burchard, 580 F.3d at 345 (citing United States v. Robinson, 547 F.3d 632, 637 (6th Cir.2008)).
A violation of § 1201 is only a criminal offense under § 1204(a) if it is committed “willfully” and for commercial or private financial gain. The term “willfully,” when used in a criminal statute, generally refers to conduct that involves “a bad purpose,” or “careless disregard [for] whether a person has the right so to act.” Bryan v. United States, 524 U.S. 184, 191 n. 12, 13, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998); the term marks a distinction between deliberate criminal conduct and unwitting or oblivious conduct which does not indicate a culpable state of mind. Id. at 191, 118 S.Ct. 1939.
In order to establish a willful violation of a statute, “the Government must prove that the defendant acted with knowledge that his conduct was unlawful.” Id. at 192, 118 S.Ct. 1939 (quoting Ratzlaf v. United States, 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)); accord Dixon v. United States, 548 U.S. 1, 5, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006) (“[T]he term willfully ... requires a defendant to have acted with knowledge that his conduct was unlawful.”); United States v. Roth, 628 F.3d 827, 834 (6th Cir.2011) (“[I]n criminal cases, in order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.”). Therefore, at trial, the Government was required to prove that Reichert knew that it was unlawful for him to sell modified video game consoles.
The district court should have instructed the jury to deliver a guilty verdict if it was convinced that Reichert:
[Deliberately ignored a high probability that he was breaking the law designed to effectively control access to a work copyrighted under federal law ...
Instead, the district court instructed the jury to deliver a guilty verdict if Reichert:
[D]eliberately ignored a high probability that he was trafficking in technology 'primarily designed to circumvent technological measures designed to effectively control access to a work copyrighted under federal law ...
It is undisputed that, standing alone, this portion of the jury instruction did not properly reflect the DMCA’s mandate that, in order for criminal liability to attach, the Government had to prove that Reichert knew his conduct to be unlawful. 17 U.S.C. § 1204(a); Roth, 628 F.3d at 834 (“[I]n order to establish a ‘willful’ violation *462 of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.”)- Moreover, the district court’s error was not a minor misstatement of law — it directly undermined Reichert’s only defense at trial.
The only remaining question is whether other portions of the instruction, when combined with the district court’s misstatement of law and viewed in its entirety, salvaged the jury instruction such that Reichert was not deprived of a fair trial. In my view, it did not. Accordingly, the judgment should be reversed because the instruction, viewed as a whole, permitted the jury to deliver a guilty verdict upon a lesser finding than the statute’s willfulness requirement. See 17 U.S.C. § 1204.
The majority concludes that the misstated part of the instruction was harmless because it was accompanied by and “sandwiched between” two proper statements of law, but the fact that other portions of the jury instruction provided a more accurate statement of law did nothing to restore the incorrectly stated part of the instruction. If the district court had acknowledged its mistake and explicitly corrected itself, then perhaps it could be said that the jury instruction, viewed as a whole, was proper. Here, however, there is simply no way of knowing whether the jurors relied on the district court’s incorrect misstatement of law or its accompanying, yet contradictory, correct statements- of the law. Although other parts of the instruction may have provided the necessary clarity for some jurors to understand what the district court meant, there was no indication that the court was correcting its earlier statement or that the jury should apply the correct statement of the law instead of relying on the district court’s incorrect statement. While it is certainly possible that the jury relied on the correct portion of the instruction, the likelihood that it relied on the incorrect portion seems equally probable. Since we simply cannot know, to conclude otherwise would require impermissible speculation. See Davis v. Georgia, 451 U.S. 921, 922, 101 S.Ct. 2000, 68 L.Ed.2d 312 (1981) (explaining that reversal is necessary when “[a]n appellate court can do no more than guess at what a jury might have done ... [if] properly instructed”).
I would be more inclined to agree with the majority if the DMCA’s anti-circumvention provision were itself less ambiguous. In this case, however, the charging statute was arguably open to various interpretations. Under these circumstances, I cannot agree with the majority that the additional confusion generated by a jury instruction that muddled the mens rea element of the charge was harmless. See United States v. Salisbury, 983 F.2d 1369, 1377 (6th Cir.1993).
The emphasis upon mens rea in the vast majority of criminal statutes is “in keeping with our longstanding recognition of the principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.” Liparota v. United States, 471 U.S. 419, 427-28, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) (citing Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); United States v. U.S. Gypsum Co., 438 U.S. 422, 437, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); United States v. Bass, 404 U.S. 336, 347-48, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955); United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-222, 73 S.Ct. 227, 97 L.Ed. 260 (1952)). The rule of lenity, in turn, “ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining crimi *463 nal liability.” Liparota, at 427-28, 105 S.Ct. 2084 (citing Bass, 404 U.S. at 348, 92 S.Ct. 515). Where “congressional purpose is unclear,” the rule of lenity “provides a time-honored interpretive guideline” that criminal culpability does not attach unless it has been clearly established. See Lipa-rota, at 418,105 S.Ct. 2084.
In cases such as this one, where the charging statute is subject to various interpretations, the relationship between adequacy of notice and a statute’s scienter requirement may, under certain circumstances, resolve potential ambiguities. See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (finding that “a scienter requirement may mitigate a law’s vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed”). Therefore, latent ambiguities in the DMCA’s anti-circumvention provision could have been less of a concern in this case if the jury instruction had properly ensured that the Government met its obligation to prove the willfulness element of Reichert’s alleged crime. Here, however, the opposite is true — the jury instructions convoluted the scienter element of the charge and aggravated the already heightened risk of error stemming from a statute that was itself subject to various interpretations concerning the exact legal status of the defendant’s conduct.
Finally, although the issue on appeal is neither the weight nor sufficiency of the evidence, I mention it here because it leads to the conclusion that an error must have been present for the jury to deliver a guilty verdict despite overwhelming the evidence in support of Reichert’s defense. If the evidence at trial had done more to establish the Government’s contention that Reichert knew he was breaking the law, then I might be more inclined to agree with the majority. Here, however, Reic-hert put forth overwhelming evidence to establish his defense. It is undisputed that Reichert operated his console modification business openly; he advertised his services and even opened a separate bank account for the business because he planned to file tax returns on the income it generated. Moreover, at trial, an agent who had engaged in online conversations with Reichert during the investigation testified that Reichert seemed to believe that video game modifications and mod chips occupied a legal “gray area.” Given the ongoing debate over the scope of the DMCA’s anti-circumvention provision, Reichert’s point of view was not unsupported. See e.g., Chamberlain, 381 F.3d at 1203-04; Lexmark, 387 F.3d at 547-48; cf. MDY Indus., 629 F.3d at 948. In fact, several law review articles published around the time of Reichert’s arrest suggest that his understanding of mod chips’ legal status was no different from the views expressed by individuals who had a much more sophisticated understanding of the law. See, e.g., Vijay G. Brijbasi, Game Console Modification Chips: The Effect of Fair Use and the Digital Millennium Copyright Act on the Circumvention of Game Console Security Measures, 28 Nova L.Rev. 411, 426 (2004); Phillip A. Harris Jr., Mod Chips and Homebrew: A Recipe for Their Continued Use in the Wake of Sony v. Divineo, 9 N.C. J.L. & Tech. 113, 115-118 (2007); Zvi Rosen, Mod, Man, and Law: A Reexamination of the Law of Computer Game Modifications, 4 Chi.-Kent J. Intell. Prop. 196 (2005); Lewis Stevenson, Fair Circumvention: A Judicial Analysis for the Digital Millennium Copyright Act Using the Playstation 3 as a Case Study, 21 S. Cal. Interdisc. L.J. 681 (2012). Nevertheless, the jury delivered a guilty verdict.
If the jury had received a proper instruction on the law, which imposed the *464 highest possible burden upon the Government to demonstrate that Reichert “willfully” violated the DMCA, it seems highly improbable that it would have convicted Reichert on the evidence presented at trial.
III.
For the foregoing reasons, I respectfully dissent from Part II of the majority opinion. While I agree with the majority as to the other issues presented by this appeal, I would reverse on the basis of the erroneous jury instruction.

. For example, a common complaint about the Nintendo Wii is that, unlike other popular video game consoles, such as the Sony Plays-tation and Microsoft Xbox, the Wii cannot play ordinary DVDs. The demand for a solution to this perceived deficiency is one of several reasons why a consumer might purchase a mod chip or seek to have one installed into a video game console.
Mod chips can also be used to remedy failures and solve problems in video game consoles, or to run back-up copies of legally purchased video games to replace damaged or lost originals. See 321 Studios v. Metro Goldwyn Mayer Studios, Inc., 307 F.Supp.2d 1085, 1097 (N.D.Cal.2004) (finding that copyright law does not prohibit consumers from creating duplicate "back-up” copies of legally purchased video games).
In addition, mod chips enable video game enthusiasts and more sophisticated gamers to create and play "homebrew” video games developed by independent amateur game creators and hobbyists. See Lewis Stevenson, Pair Circumvention: A Judicial Analysis for the Digital Millennium Copyright Act Using the Playstation 3 As A Case Study, 21 S. Cal. Interdisc. L.J. 681, 682 n. 7 (2012) ("Home-brew is a term for software applications created by consumers rather than licensed developers.”) (citing Mike Musgrove, Routine Upgrades are the Bane of 'Homebrew' Enthusiasts, Wash. Post, July 6, 2006, at D04).

. See Vijay G. Brijbasi, Game Console Modification Chips: The Effect of Fair Use and the Digital Millennium Copyright Act on the Circumvention of Game Console Security Meas *460 ures, 28 Nova L.Rev. 411, 436 (2004). Under the reverse engineering exception at § 1201(f), a console modification designed "primarily” for the purpose of enhancing a console's "interoperability,” such as accessing legitimately purchased video games across multiple platforms, or to enable the playing of independently designed non-infringing "homebrew” video games would appear to be lawful under the DMCA. See Stevenson, supra n. 1; Phillip A. Harris Jr., Mod Chips and Homebrew: A Recipe for Their Continued Use in the Wake of Sony v. Divineo, 9 N.C. J.L. & Tech. 113, 115-118 (2007). Similarly, installing a mod chip into a console like the Wii for the purpose of enhancing its functionality, so that it can play ordinary and lawfully purchased DVDs, would also seem to fall under the reverse engineering exception at § 1201(f), so long as such a modification was not designed "primarily ... for the purpose of” playing illegal, pirated video games. See 17 U.S.C. §§ 1201(a)(2)(A), 1201(f).

. Meanwhile, at the time of this writing, there are two bills currently pending before Congress that would override much of the framework established through the DMCA’s regulatory rulemaking process since its passage. See The Unlocking Technology Act of 2013, H.R. 1892, 113th Cong. (2013); The Unlocking Consumer Choice and Wireless Competition Act, H.R. 1123, 113th Cong. (2014).